1

2

3

4            UNITED STATES DISTRICT COURT

5           NORTHERN DISTRICT OF CALIFORNIA

6                 SAN JOSE DIVISION

7

8    BENJAMIN SHERMAN, et al.,              Case No.  20-cv-06441-VKD

                 Plaintiffs,
9
                                           **ORDER GRANTING IN PART AND**
10        v.                               **DENYING IN PART DEFENDANT'S**
                                           **MOTION FOR SUMMARY**
11   THE REGENTS OF UNIVERSITY OF          **JUDGMENT**
     CALIFORNIA,
                                           Re: Dkt. No. 35
12               Defendant.

13

14       Plaintiffs Benjamin Sherman and Zayd Hammoudeh assert claims against defendant The

15   Regents of the University of California ("The Regents" or "the University") for deliberate

16   indifference to sexual harassment and retaliation in violation of Title IX of the Education

17   Amendments of 1972, 20 U.S.C. § 1681 *et seq.*; deliberate indifference to harassment based on

18   race and/or national origin in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C.

19   § 2000d *et seq.*; hostile work environment and discrimination based on race, religion, and/or

20   national origin in violation of the Fair Employment and Housing Act ("FEHA"), California

21   Government Code §§ 12900 and 12940; intentional discrimination in violation of the Unruh Civil

22   Rights Act, California Civil Code § 51 *et seq.*; and discrimination in education in violation of

23   California Education Code §§ 220 and 66270 *et seq.*  Dkt. No. 1, Ex. A.  These claims arise out of

24   plaintiffs' interactions with Professor Dimitris Achlioptas at the University of California Santa

25   Cruz, where both plaintiffs were students.[1]

26       The Regents move for summary judgment as to all of plaintiffs' claims.  Dkt. No. 35.

27

28   _____

     [1] All parties who have appeared have consented to magistrate judge jurisdiction.  Dkt. Nos. 8, 9.

United States District Court
Northern District of California

Having considered the parties' briefs and the arguments made at the hearing on this motion, the Court grants The Regents' motion for summary judgment as to Mr. Sherman's Title IX retaliation claim, Mr. Sherman's FEHA national-origin discrimination claim, and Mr. Hammoudeh's FEHA hostile work-environment claim.  The Court denies the motion as to the remaining claims.

## I.      BACKGROUND[2]

### A.      Parties

#### 1.      Plaintiff Benjamin Sherman

Benjamin Sherman began his studies as an undergraduate at the University of California, Santa Cruz ("UCSC") in the fall of 2013.  Dkt. No. 48-4, Ex. 1 at 36.  In the spring of 2016, during his junior year at UCSC, Mr. Sherman became an undergraduate research assistant for Professor Dimitris Achlioptas in the computer science department.  Dkt. No. 48-4, Ex. 1 at 49. After completing his bachelor's degree in computer science, Mr. Sherman started a master's degree program at UCSC in the fall of 2017.  Dkt. No. 48-4, Ex. 1 at 19.  He continued doing research under the advisement of Professor Achlioptas and worked for him as a teaching assistant until December 2018.  Dkt. No. 48-4, Ex. 1 at 19; Dkt. No. 48-4, Ex. 11 at 3.  Mr. Sherman received his master's degree in the spring of 2019.  Dkt. No. 36-2, Ex. 26A at 163.

#### 2.      Plaintiff Zayd Hammoudeh

Zayd Hammoudeh began his doctoral studies in computer science at UCSC in September 2017.  Dkt. No. 36-2, 27A at 30; Dkt. No. 47-4 ¶ 2.  Professor Achlioptas served as Mr. Hammoudeh's advisor during his first year as a PhD student.  Dkt. No. 36-2, Ex. 14A at 1.  During that time, Mr. Hammoudeh conducted research with Professor Achlioptas and worked in his lab. Dkt. No. 48-4, Ex. 24 at 6, 9.  Mr. Hammoudeh took a leave of absence from UCSC in the fall of 2018, after accepting the University of Oregon's offer of admission to its graduate program.  Dkt. No. 36-2, Ex. 27A at 12, 177, 182.

#### 3.      Defendant The Regents of the University of California

The Regents govern the University of California, a public educational institution with

---

[2] Except as noted, the facts are not disputed.

United States District Court
Northern District of California

multiple campuses, including UCSC, located in Santa Cruz, California.  Dkt. No. 1, Ex. A ¶ 7.

Plaintiffs allege, and The Regents do not dispute, that the University receives federal funding and

financial assistance within the meaning of 20 U.S.C. § 1681.  *Id.*  Professor Achlioptas was

employed by the University as a full Professor of Computer Science and Engineering and was a

member of the Academic Senate at UCSC until December 2019 when he resigned.  Dkt. No. 35-2

¶ 4.

### B.    Professor Achlioptas's Conduct

Beginning in the spring of 2016, while Mr. Sherman worked as an undergraduate research

assistant, Professor Achlioptas began referring to Mr. Sherman using derogatory language, such

calling him a "a moron," "a retard," and "stupid."  Dkt. No. 36-2, Ex. 1A at 59.  This behavior

continued into the fall of 2016 when Professor Achliotpas began also using "graphic sexual

language" when speaking to or about Mr. Sherman.  Dkt. No. 36-2, Ex. 26A at 68.

In the fall of 2017, after Mr. Sherman began his graduate studies at UCSC, he conducted

research with Professor Achlioptas and another professor in the chemistry department, Professor

Sgourakis.  Dkt. No. 1, Ex. A ¶ 12; Dkt. No. 36-2, Ex. 1A at 67, 79, 89, 101.  At about the same

time, in the fall of 2017, Mr. Hammoudeh also began conducting research with Professor

Achlioptas.  Dkt. No. 1, Ex. A ¶ 36.  Professor Achlioptas repeatedly made crude and sexually

explicit remarks to and about both students.  Dkt. No. 36-2, Ex. 1A at 101, Ex. 26A at 88; Dkt.

No. 36-2, Ex. 27A at 202–3, 205.  In addition, Professor Achlioptas referred to Mr. Hammoudeh

as "autistic" and as a "terrorist" in front of other faculty members and students.  Dkt. No. 36-2, Ex.

27A at 204, 9–10.

### C.    Mr. Hammoudeh's August 2018 Communications

On June 11, 2018, Mr. Hammoudeh sent Professor Achlioptas an email regarding the

"unhealthy and unsustainable" relationship between them.  Dkt. No. 48-4, Ex. 18 at 1–2.  Mr.

Hammoudeh wrote that the "comments on my race, religion, perceived 'autism,' appearance etc.

are not appropriate and cannot occur again in any form."  *Id.* at 2.  Further, Mr. Hammoudeh wrote

that the "non-constructive, ad hominem insults, are demoralizing, toxic, and intolerable."  *Id.* at 1.

Although Professor Achlioptas acknowledged that the "situation, as you perceive it, is untenable

United States District Court
Northern District of California

1    and cannot continue," *id.*, he did not change his behavior.  Dkt. No. 36-2, Ex. 27A at 56–57.

2        On August 28, 2018, Mr. Hammoudeh emailed Alexander Wolf, Dean of the Baskin

3    School of Engineering, describing in detail Professor Achlioptas's treatment of Mr. Hammoudeh.

4    Dkt. No. 36-2, Ex. 14; Dkt. No. 48-4, Ex. 20.  The email's subject title was "Race-Based

5    Harassment & Professorial Abuse and Misconduct in the BSOE," and it was copied to the chairs

6    of the computer science and engineering department, as well as a representative of the graduate

7    student union.  Dkt. No. 36-2, Ex. 14 at 1, 3; Dkt. No. 48-4, Ex. 20 at 1, 3.  The email summarized

8    Professor Achlioptas's abusive behavior, which included the following: repeatedly calling Mr.

9    Hammoudeh a "terrorist"; mocking Mr. Hammoudeh's appearance, such as his long beard grown

10   for religious and cultural reasons, and comparing Mr. Hammoudeh's appearance to the persons in

11   "most-wanted" posters; repeatedly telling Mr. Hammoudeh that he is "autistic" and had an

12   "autistic brain"; routinely insulting Mr. Hammoudeh with terms like "fucking moron,"

13   "incompetent," "idiot," "loser," and "incel"; regularly telling Mr. Hammoudeh to "shut the fuck

14   up"; and telling Mr. Hammoudeh that he has a "small penis" and needs a "penis transplant."  Dkt.

15   No. 36-2, Ex. 14 at 1–2; Dkt. No. 48-4, Ex. 20 at 1–2.

16       The email further explained that other students and professors had witnessed much of

17   Professor Achlioptas's behavior toward Mr. Hammoudeh, and he noted that another student, Mr.

18   Sherman, was also the target of Professor Achlioptas's "inappropriate and abusive behavior."  *Id.*

19   at 2.  Mr. Hammoudeh suggested that UCSC contact Mr. Sherman, among others, to corroborate

20   Mr. Hammoudeh's complaint.  *Id.*  The email expressed Mr. Hammoudeh's hope that "the

21   university administration takes this matter seriously so no one in the future suffers as I did."  *Id.*

22       **D.    The University's Response to Mr. Hammoudeh's Allegations**

23       On August 28, 2018, the same day he sent his email, UCSC's Title IX Office sent an email

24   to Mr. Hammoudeh proposing a meeting.  Dkt. No. 36-2, Ex. 27 at 94.  On August 30 or 31, 2018,

25   Mr. Hammoudeh met with Cherie Scricca, then the interim director of UCSC's Title IX Office.

26   Dkt. No. 48-4, Ex. 3 at 39; Dkt. No. 36-2, Ex. 27 at 70, 92, 104.  At this meeting, Mr.

27   Hammoudeh discussed the contents of his August 28, 2018 email with Ms. Scricca.  Dkt. No. 48-

28   4, Ex. 3 at 102–8.  In addition, Ms. Scricca's contemporaneous notes of their meeting reflect that

Mr. Hammoudeh told her Professor Achlioptas's treatment of Mr. Sherman was "verbally and psychologically abusive." *Id.* at 182; Dkt. No. 48-5, Ex. 45. The notes also reflect Mr. Hammoudeh stating, "I don't think he should be around students at all" in reference to Professor Achlioptas. *Id.* at 188; Dkt. No. 48-5, Ex. 45. Ms. Scricca apparently concluded that Mr. Hammoudeh's allegations did not amount to a violation of the University of California's Sexual Violence and Sexual Harassment Policy ("SVSH Policy"). *Id.* at 240.

When asked in deposition what steps the Title IX Office took to protect Mr. Hammoudeh or any other students from Professor Achlioptas, Ms. Scricca responded, "I don't recall because I—and I don't know." Dkt. No. 48-4, Ex. 3, 131. Ms. Scricca acknowledged that while she was interim director, neither she nor anyone at the Title IX Office reached out to Mr. Sherman about Professor Achliaptos's conduct. Dkt. No. 48-4, Ex. 3 at 141. It appears that Ms. Scricca expected Isabel Dees, who recently had been hired as the new director of the Title IX Office, to address Mr. Hammoudeh's concerns. *Id.*, Ex. 3 at 136. At the time Ms. Scricca left the Title IX Office, sometime in January or February 2019, she "had no idea what—what was happening at all" in Mr. Hammoudeh's case; she "didn't understand why" an investigation was not yet underway. *Id.*, Ex. 3 at 140.

After receiving his August 28, 2018 email, Dean Wolf forwarded Mr. Hammoudeh's complaint to "other university administrators at UCSC," but did not discuss with anyone whether Professor Achlioptas should continue interacting with students pending further investigation of Mr. Hammoudeh's complaint. Dkt. No. 35-5, ¶ 4; Dkt. No. 48-4, Ex. 5 at 104. The following week, Dean Wolf and Mr. Hammoudeh met to discuss Mr. Hammoudeh's allegations. Dkt. No. 35-5, ¶ 4.

On September 11, 2018, Dean Wolf forwarded Mr. Hammoudeh's complaint to Susan Fellows, then the Director of Academic Employee Relations at UCSC. Dkt. No. 48-4, Ex. 5 at 159. Dean Wolf's message to Ms. Fellows included the following statement: "The issues raised potentially involve all of discrimination, Title IX, and faculty code of conduct. … I understand that the first two are already being discussed by the appropriate offices. I would like to ask that you take up the third and open an investigation into possible violations of the faculty code of

United States District Court
Northern District of California

conduct.  Please let me know if you would like to discuss this.  I would appreciate receiving status updates from you as appropriate."  Dkt. No. 48-5, Ex. 29 at 2.

On September 12, 2018, Ms. Fellows replied to Dean Wolf that she had spoken to a university official who was consulting with the Title IX Officer (Ms. Scricca) and the Dean of Students about the matter, and that the university official or the Title IX Officer would discuss further with Ms. Fellows.  Dkt. No. 48-5, Ex. 29 at 2.  Ms. Fellows added that she did not personally authorize investigations involving the Faculty Code of Conduct, as that "is the [Executive Vice Chancellor]'s role," but that Ms. Fellows would follow up with the Executive Vice Chancellor to discuss next steps.  *Id.*

On September 26, 2018, Ms. Fellows advised Dean Wolf that she had learned that Mr. Hammoudeh "is being referred to the student grievance process that's managed in the Dean of Students Office" and that Mr. Hammoudeh had been made aware of the "formal complaint process involving alleged violations of the Faculty Code of Conduct."  Dkt. No. 48-5, Ex. 29 at 1.  Further, Ms. Fellows had brought the conduct described by Mr. Hammoudeh to the Executive Vice Chancellor's attention.  *Id.*  Ms. Fellows indicated that it was the Executive Vice Chancellor's expectation "that the dean and/or chair would file a formal complaint" and that she was available to assist Dean Wolf.  Dean Wolf replied that he would be "pleased to receive your help/guidance in preparing a formal complaint.  Let me know how you'd like to proceed."  *Id.*  However, it appears that Dean Wolf and Ms. Fellows did not meet, and Dean Wolf did not prepare a formal complaint to initiate a faculty code of conduct investigation.  Dkt. No. 48-5, Ex. 5 at 181–82; Dkt. No. 48-5, Ex. 6 at 158–59.  Neither Dean Wolf nor Ms. Fellows contacted Mr. Sherman to inquire about Professor Achlioptas's conduct towards him.  Dkt. No. 48-4, Ex. 6 at 140–41.

On September 19, 2018, Lucy Rojas, Assistant Vice Chancellor and Chief of Staff of UCSC's Division of Student Affairs and Success, reached out to Mr. Hammoudeh to let him know that she was available as a resource.  Dkt. No. 35-4 ¶ 5.  Ms. Rojas also provided a link to the Student Grievance Process.  *Id.* ¶ 6.  Ms. Rojas and Garrett Naiman, Associate Vice Chancellor and Dean of Students, met with Mr. Hammoudeh via Zoom on October 1, 3, and 9, 2018 to talk about the options he could pursue to address the concerns raised in his August 28, 2018 email.  *Id.*

1    According to Ms. Rojas, Mr. Hammoudeh "expressed the need to further review his August 28,

2    2018 email to determine whether he wanted to add or remove information and said he wanted to

3    explore the potential remedies." *Id.*

4         On November 26, 2018, Mr. Hammoudeh submitted by email a formal grievance against

5    Professor Achlioptas to Ms. Rojas and copied Dean Wolf, Ms. Scricca, and others.  Dkt. No. 48-5,

6    Ex. 30; Dkt. No. 35-4 ¶ 2.  The grievance included 23 allegations (later amended to include an

7    additional allegation) and referenced Title IV, Title IX, and the Americans with Disabilities Act of

8    1990.  Dkt. No. 48-5, Ex. 30; Dkt. No. 35-6, Ex. 16 at 3.  Most of these allegations described the

9    same conduct that Mr. Hammoudeh had included in his August 28, 2018 email to Dean Wolf.  *See*

10   *id.* at 2–4.

11        On December 16, 2018, Ms. Rojas responded to Mr. Hammoudeh's November 26, 2018

12   grievance with two separate emails.  Dkt. No. 35-6, Ex. 18.  Both emails were copied to Ms. Isabel

13   Dees, Ms. Fellows, Mr. Garrett Naiman, Chief of Staff Linda Rhoads, Campus Provost and

14   Executive Vice Chancellor Marlene Tromp, and Dean Wolf.  *Id.* at 2, 5.  In the first email, Ms.

15   Rojas wrote that Mr. Hammoudeh's grievance regarding his first 20 allegations had been

16   "accepted."  *Id.* at 1.  However, Ms. Rojas advised that the remedies Mr. Hammoudeh sought

17   could not be afforded through the student grievance process; rather, "the most appropriate

18   university process" to address Mr. Hammoudeh's allegations and requested remedies was the

19   formal complaint process under the Faculty Conduct and the Administration of Discipline policy.

20   *Id.*  Ms. Rojas stated that Dean Wolf and Mr. Naiman would refer his complaint to this process,

21   and that Mr. Hammoudeh would be "listed as a complainant unless you inform me in writing by

22   Wednesday, December 19, 2018, that you do not want to be specifically named as a complainant."

23   *Id.*  In her second email, Ms. Rojas wrote that, in her capacity as the "Complaint Resolution

24   Officer," "[b]ased on the information provided to me, I have determined that allegations #21, #22,

25   and #23 of your grievance do not allege facts that are in violation of university policy and

26   therefore the grievance is dismissed."  Dkt. No. 35-6, Ex. 18 at 4.  Ms. Rojas did not provide an

27   explanation for her findings beyond this statement.  *See id.* at 3–5.  Ms. Rojas also dismissed Mr.

28   Hammoudeh's additional allegation #24.  Dkt. No. 35-6, Ex. 19 at 4.

United States District Court
Northern District of California

On December 21, 2018, Mr. Hammoudeh emailed Ms. Rojas to request an independent third-party investigation into his allegations against Professor Achlioptas.  Dkt. No. 35-6, Ex. 17 at 5.  The record does not reflect Ms. Rojas's response to this request.  However, on December 24, 2018, Ms. Rojas advised Mr. Hammoudeh that he would be named a complainant in a Faculty Code of Conduct complaint unless he advised her by January 10, 2019 that he did not want to be a complainant.  Dkt. No. 35-4 ¶ 9.

Meanwhile, on December 5, 2018, Campus Provost and Executive Vice Chancellor Marlene Tromp sent an email titled "Demetrius Achlioptas" to Dean Wolf, copying Ms. Fellows. Dr. Tromp wrote: "As I understand it, Susan Fellows has been working with you on this, but I wanted to follow up to learn if you had filed a formal complaint, whether to Faculty Code of Conduct, ODEI, and/or Title IX (as Susan advises).  I know the Dean of Students is working with the student, but, in order to act, we must have a formal complaint."  Dkt. No. 48-5, Ex. 31.  The record does not reflect Dean Wolf's response to this inquiry.

### E.     Mr. Sherman's December 2018 Communications

On December 10, 2018, Mr. Sherman sent an email to Dean Wolf describing his concerns regarding Professor Achlioptas's conduct.  Dkt. No. 35-6, Ex. 26 at 86; Dkt. No. 48-4, Ex. 9.  Mr. Sherman met with Dean Wolf on December 13, 2018.  Dkt. No. 35-6, Ex. 26 at 87–88.  Mr. Sherman described a pattern of harassment by Professor Achlioptas that was both "intellectually demeaning" and contained graphic sexualized language, culminating in a meeting on December 7, 2018 during which Professor Achlioptas had "really wild outbursts" that led Mr. Sherman to "cut[] off all communication with him."  *Id.* at 88–89.  Mr. Sherman stated that he had been reluctant to report Professor Achlioptas's conduct because Mr. Sherman had not yet received credit for his years of research with the professor.  *Id.* at 89–90.  On December 14, 2018, Dean Wolf emailed Mr. Sherman that he would soon hear from Ms. Fellows.  *Id.* at 95–96; Dkt. No. 48-4, Ex. 9.

### F.     The University's Further Response to Plaintiffs' Allegations

On December 16, 2018, Mr. Hammoudeh emailed Ms. Scricca of the Title IX Office requesting an explanation for how the Office might handle the Title IX violations in his case.  Dkt. No. 48-4, Ex. 22 at 8.  He prefaced his request with the explanation that UCSC's Dean of Students

1  (Mr. Naiman) had directed his grievance to the "Faculty Discipline process," but that to Mr.

2  Hammoudeh's recollection, "Title IX and I never discussed handling the dispute outside the

3  confines of the either the Title IX office or the Dean of Students office." *Id.*

4     On December 18, 2018, Ms. Scricca responded that she had "recently learned" that Mr.

5  Hammoudeh's allegations had been directed to the Faculty Code of Conduct disciplinary process.

6  *Id.* at 7.  She wrote that when they had met in September, "I let you know that the allegations

7  related to gender (as articulated), although not behavior we condone, would in and of themselves

8  not amount to a Sexual Violence/Sexual Harassment (SVSH) policy violation, and thus are not

9  well or effectively served through the Title IX Investigation process.  However, the Title IX Office

10  is concerned about the behavior you described and would seek a form of resolution other than an

11  investigation to address the gender-related concerns, however, such a process will not involve or

12  lead to discipline." *Id.*

13     On December 21, 2018, Mr. Hammoudeh replied to Ms. Scricca, expressing concern that

14  the Title IX Office had been unaware that his allegations had been directed to the Faculty Code of

15  Conduct disciplinary process.  *Id.*  Further, he wrote that he did not recall any statement by the

16  Title IX office that his gender-related allegations would not amount to a sexual harassment policy

17  violation.  *Id.* at 6.  Ms. Scricca responded that same day, clarifying that "this initial assessment

18  was communicated by me to you during our in-person meeting on August 30.  At that time, the

19  gender-related comments were part of a long and varied list of concerns that you had about

20  Professor Achlioptas, that included allegations that were outside the scope and work of the Title

21  IX Office." *Id.* at 4.  She continued: "It is true that you contacted us while we were considering

22  how best to go about addressing all of the gender-related concerns you have raised to date, but

23  please know that you did not have to contact us again in order for us to take action on your

24  allegations." *Id.* at 4–5.  Ms. Scricca also told Mr. Hammoudeh that "another individual has come

25  forward with gender-related concerns regarding Professor Achlioptas," and that "those concerns

26  coupled with yours" now prompted the Title IX Office to move forward with an investigation.  *Id.*

27  at 5.  Ms. Scricca asked Mr. Hammoudeh to let the Title IX Office know if he would like to

28  participate in such an investigation, but added that the new Title IX Officer, Ms. Dees, would be

happy to talk to him about his concerns should he decline to participate.  *Id.* at 5.

On December 26, 2018, Mr. Hammoudeh responded, addressing both Ms. Scricca and Ms. Dees.  *Id.* at 3–4.  He expressed his appreciation that the Title IX Office had offered to do an investigation, writing: "I have been pushing for an investigation from the beginning so the facts can be made unambiguous because I truly believe the actions in this case were unconscionable." *Id.* at 3.  He continued: "I would appreciate the opportunity to have a meeting over Skype or the like to discuss the investigation."  *Id.* at 4.  Ms. Dees responded on January 8, 2019, writing that she "would be happy to set up a zoom meeting with you," and proposed to meet the following week.  *Id.* at 2.

On January 10, 2019, Mr. Hammoudeh wrote again to Ms. Dees, requesting her feedback. *Id.* at 1–2.  He first noted that "UCSC placed a no-contact order against Dimitris [*sic*] with respect to me in November 2018.  Dimitris violated this order on December 20, 2018.  I have received no follow-ups from anyone at UCSC acknowledging this violation or outlining the accompanying sanctions."  *Id.* at 1.  He also explained that Mr. Sherman had given up his two lab workspaces on campus out of fear of running into Professor Achlioptas.  *Id.*  He asked for guidance regarding how the Title IX investigation would affect and be affected by the Faculty Code of Conduct disciplinary process, as that would inform his decision whether to participate in the Faculty Code of Conduct disciplinary process.  *Id.* at 2.

Meanwhile, on December 17, 2018, Ms. Fellows reached out to Mr. Sherman.  Dkt. No. 35-6, Ex. 26 at 110; Dkt. No. 48-4, Ex. 10 at 3.  On December 21, 2018, Ms. Fellows met with Mr. Sherman and described the process for filing a formal disciplinary complaint.  Dkt. No. 35-6, Ex. 26 at 110–12.  During this meeting, Mr. Sherman described Professor Achlioptas's behavior to Ms. Fellows.  *Id.* at 110.  On December 22, 2018, Ms. Fellows sent a follow-up email to Mr. Sherman, including a link to UCSC's Faculty Conduct and the Administration of Discipline policy.  Dkt. No. 48-4, Ex. 10 at 2; Dkt. No. 35-6, Ex. 5.

Ms. Dees, the new director of the Title IX Office, separately reached out to Mr. Sherman on December 18, 2018, and the two met on December 21, 2018.  Dkt. No. 35-6, Ex. 26 at 99–100. At the meeting Mr. Sherman described Professor Achlioptas's conduct to Ms. Dees, including the

sexual nature of Professor Achlioptas's statements to him.  *Id.* at 101.  Mr. Sherman indicated that he wanted the Title IX Office to take "the strongest action that they possibly could" and that he wanted to help as much as he possibly could.  *Id.* at 104.

On December 21, 2018, Campus Provost and Executive Vice Chancellor Marlene Tromp placed Professor Achlioptas on involuntary leave with pay.  Dkt. No. 35-6, Ex. 22.  In her letter to Professor Achlioptas, Dr. Tromp wrote: "The reasons for the imposition of this involuntary leave are multiple reports of concerns and complaints alleging verbally abusive and coercive behavior towards students, and harassing and discriminatory behavior towards students in violation of the Faculty Code of Conduct (APM 015), including but not limited to, APM 015, Part II.A.2 and 5." *Id.* at 1.  She continued that "[f]or the duration of this involuntary leave you are prohibited from coming to campus for any work-related reason.  You are also prohibited from engaging in any work-related duties or activities that would involve any contact with UCSC students, including contact by phone, email, text, and/or through third-parties." *Id.*

On January 22, 2019, Mr. Sherman filed a formal complaint against Professor Achlioptas pursuant to the Faculty Code of Conduct disciplinary process.  Dkt. No. 48-5, Ex. 11; Dkt. No. 35-6, Ex. 21.  He attached a detailed letter to his complaint, which described Professor Achlioptas' behavior towards him and others from March 2016 until December 2018.  Dkt. No. 48-5, Ex. 11 at 3.  That evening, Ms. Fellows responded to Mr. Sherman's email, and confirmed that she had reviewed his documents and that Mr. Sherman's formal complaint was accepted.  Dkt. No. 48-5, Ex. 12.  Ms. Fellows told Mr. Sherman that she would forward these documents to the Campus Provost consistent with policy, and that she would provide him with updates.  *Id.*

On January 26, 2019, Mr. Naiman submitted a formal complaint against Professor Achlioptas on behalf of Mr. Hammoudeh, pursuant to the Faculty Code of Conduct disciplinary process.  Dkt. No. 35-6, Ex. 20.

On February 6, 2019, Campus Provost and Executive Vice Chancellor Marlene Tromp informed Professor Achlioptas of the revised terms she was imposing during his involuntary leave with pay.  Dkt. No. 35-6, Ex. 23.  Specifically, Dr. Tromp wrote that Professor Achlioptas was now prohibited from the following:

- Coming to the campus for any work-related reason;
- Engaging in any work-related duties or activities with the exception of: 1) engaging in the project at Google for which you have requested prior approval under APM 025;
- Contacting UCSC students, faculty, and staff, including contact by phone, email, text, and/or through third-parties, with the exception of: 1) engaging in monitored email contact only with your department chair and the following four PhD students: **[redacted]**, 2) communicating with your department chair for the reasons outlined in this letter and with Susan Fellows, Director of Academic Employee Relations, and 3) contacting a central campus office such as Benefits or Payroll.

*Id.* at 1.  Dr. Tromp wrote that this involuntary leave would remain in effect "until the allegations are resolved by the investigation or when disciplinary proceedings are concluded and a decision has been made by the Chancellor whether to impose disciplinary sanctions."  *Id.* at 2.

On February 7, 2019, Title IX Officer Ms. Dees emailed Mr. Sherman to notify him that the Title IX Office had initiated a formal investigation of his complaint against Professor Achlioptas.  Dkt. No. 48-5, Ex. 13.  Ms. Dees also notified Professor Achlioptas of the initiation of the investigation.  Dkt. No. 48-5, Ex. 38.

On July 16, 2019, the investigators assigned by the Title IX Office produced a "Report of Investigation" regarding Mr. Sherman's complaint against Professor Achlioptas.  Dkt. No. 48-5, Ex. 53.  The report concluded that Professor Achlioptas's conduct had violated the University of California's SVSH Policy.  *Id.* at 1.  On May 20, 2020, an investigator assigned by the University of California's Systemwide Title IX Office "preliminarily determined" that Professor Achlioptas's conduct with Mr. Hammoudeh also had violated the University of California's SVSH policy.  Dkt. No. 48-6, Ex. 55 at 129.

On October 11, 2019, Ms. Dees issued a "mutual no contact directive" between Professor Achlioptas and Mr. Hammoudeh.  Dkt. No. 35-6, Ex. 32.  In her notification letter to Professor Achlioptas, she informed him that the Title IX Office would be conducting an investigation of allegations that, if true, could be sexual harassment as defined in the 2016 SVSH Policy, and that the directive would be in effect from the date of the letter (October 11, 2019) through the conclusion of the investigation and adjudication of the matter.  She wrote that any violation of this directive could lead to policy violation charges, a formal investigation, and sanctions and explained that the directive included the following prohibitions:

- No direct speaking or staring
- No phone call, texting, instant messaging, email, or any other electronic communication of any kind, including through any social media or networking sites
- No notes or letters in any form
- No asking the other party's friends about them
- No contact or attempt to contact through a friend, family members, or third parties
- No encouragement on your part to a friend, family member, or third party to act on your behalf to contact, harass or intimidate, or attempt to contact, harass or intimidate.

*Id.* at 1.

On December 3, 2019, Interim Campus Provost and Executive Vice Chancellor Lori Kletzer issued a "Letter of Admonition" to Professor Achlioptas. Dkt. No. 35-6, Ex. 25. She informed Professor Achlioptas that she had received reports he had attempted to talk to Mr. Hammoudeh's wife at her workplace. *Id.* at 1. Dr. Kletzer reminded Professor Achlioptas that he was to have no contact, direct or otherwise, with Mr. Hammoudeh. *Id.*

### G.    Other Matters Concerning Mr. Sherman

On January 4, 2019, Professor Sgourakis, a professor in UCSC's chemistry department, emailed the Dean of Students regarding "report of incidents involving M.Sc. student Ben Sherman." Dkt. No. 48-4, Ex. 16. In this email, Professor Sgourakis stated that Mr. Sherman's "behavior and conduct" was "exemplary" for the first year-and-a-half upon joining a research collaboration with Professor Achlioptas, Professor Sgourakis, and another graduate student, but that "Ben's behavior began to shift" "[d]uring this fall quarter." Dkt. No. 48-5, Ex. 16 at 1. According to Professor Sgourakis, Mr. Sherman showed a "disregard for [Professor Sgourakis's] efforts" and "disrespect" toward Professor Sgourakis. *Id.* Professor Sgourakis also described, in negative terms, Mr. Sherman's attitude during the meeting between the three of them to discuss authorship credit for a research project on which they had collaborated. *Id.* at 1–2.

On February 8, 2019, Mr. Sherman emailed Dean Wolf that Professor Pang, the director of the computer science graduate program had told Mr. Sherman that "it would be inappropriate for me to write a thesis on my work with Achlioptas without Achlioptas' involvement given that Achlioptas made intellectual contributions to the work. Pang's recommendation was that I find a new research direction and aim to complete a Master's project next quarter. A Master's project is,

United States District Court
Northern District of California

1  compared with a thesis, a much smaller undertaking that I fear may reflect poorly on me in the

2  future." Dkt. No. 48-5, Ex. 37.  Dean Wolf responded two days later, writing: "I appreciate the

3  difficulty of the situation.  Please let me consult with some folks about this and get back to you

4  next week."  *Id.*  Mr. Sherman was permitted to complete work on his original thesis.  Dkt. No.

5  35-5 ¶ 9.

6          On May 27, 2019, a member of Mr. Sherman's thesis committee, Professor Luca de

7  Alfaro, emailed Mr. Sherman with a response to Mr. Sherman's thesis.  Dkt. No. 48-4, Ex. 8 at 3–

8  4.  Professor de Alfaro wrote that he would like to see two changes before he would sign the

9  thesis: "First, I think there should be a specific acknowledgment that Dimitris was your PhD

10  advisor at the time the work was done.  . . .  You could say something like: I wish to acknowledge

11  Professor Achlioptas, who as my PhD supervisor at the time this work was done provided input,

12  ideas, and guidance for the research presented in this dissertation."  *Id.* at 3.  Professor de Alfaro

13  continued that if this was the first time in which the research was being published, "I think you

14  need to specify explicitly, section by section, who your coauthors/coinventors were.  It would be

15  scientifically improper to omit this."  *Id.* at 4.  Another member of Mr. Sherman's thesis

16  committee, Professor Phokion Kolaitis, then emailed, an hour later, that he agreed with Professor

17  de Alfaro and that "it is of essence that you spell out your specific contributions either by

18  elaborating in Section 1.1 or by adding this information in each subsequent section."  *Id.* at 3.

19          Mr. Sherman responded to these communications by clarifying that Professor Achlioptas

20  was never his PhD advisor and that he was never a PhD student; rather, Professor Achlioptas

21  "unofficially advised" Mr. Sherman during his time as a graduate student.  *Id.*  Further, Mr.

22  Sherman noted that "this committee has already informed me that the acknowledgments I wrote

23  sufficed to credit my collaborators.  I am now being told, the day before I was supposed to have

24  my thesis signed by 2 members of this committee, that my thesis will not be accepted and I will

25  not receive my degree unless I credit collaborators by name in the body of my thesis."  *Id.*  Mr.

26  Sherman then wrote that although he was happy to credit his collaborators in the

27  acknowledgments, "[a]s far as [he] could tell, it is highly unusual for collaborators to be credited

28  by name in the body of a thesis."  *Id.*  Subsequently, Mr. Sherman "made adjustments to the

acknowledgments and his thesis was timely accepted effective May 31, 2019, and . . . received his master's degree according to schedule."  Dkt. No. 35-5 ¶ 11.

On July 31, 2019, Professor Sgourakis complained that Mr. Sherman did not appropriately attribute authorship to Professors Sgourakis and Achlioptas in Mr. Sherman's thesis.  Dkt. No. 35-5 ¶ 12.  Professor Sgourakis further alleged that Mr. Sherman had engaged in research misconduct.  *Id.*  The Vice Chancellor for Research commissioned an investigation into Professor Sgourakis's complaint and issued a report on November 5, 2019 finding no research misconduct by Mr. Sherman.  *Id.*

### H.    Summary of Plaintiffs' Claims

The plaintiffs bring seven claims against The Regents.  First, both Mr. Hammoudeh and Mr. Sherman allege that in violation of Title IX, 20 U.S.C. § 1681, *et seq.*, the University was deliberately indifferent to plaintiffs' complaints of sexual harassment by Professor Achlioptas.  Dkt. No. 1, Ex. A ¶¶ 75–85.  Second, Mr. Sherman alleges that in violation of Title IX, 20 U.S.C. § 1681, *et seq.*, The Regents retaliated against him for filing a formal written complaint with the Title IX Office and for participating in the investigation of sexual harassment.  *Id.*, Ex. A ¶¶ 86–94.  Third, Mr. Hammoudeh alleges that in violation of Title IV, 42 U.S.C. § 2000d, *et seq.*, the University was deliberately indifferent to Mr. Hammoudeh's complaints of race based and/or national-origin based harassment.  *Id.*, Ex. A ¶¶ 95–104.  Fourth, Mr. Hammoudeh alleges that in violation of the California Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code §§ 12940(j) and (k), The Regents subjected him to a hostile work environment based on his race, religion, and national origin.  *Id.*, Ex. A ¶¶ 105–113.  Fifth, both Mr. Hammoudeh and Mr. Sherman allege that in violation of FEHA, Cal. Gov't Code § 12940, *et seq.*, The Regents discriminated against them on the basis of their race, religion, and/or national origin by paying them less than another graduate student for work they performed for Professor Achlioptas.  *Id.*, Ex. A ¶¶ 114–121.  Sixth, both Mr. Hammoudeh and Mr. Sherman allege that in violation of the Unruh Civil Rights Act, Cal. Civ. Code § 51 *et seq.*, the University inadequately responded to their complaints of harassment and so intentionally discriminated against them on the basis of their sex, and against Mr. Hammoudeh on the basis of his race, religion, and national origin.  *Id.*,

United States District Court
Northern District of California

Ex. A ¶¶ 122–26.  Seventh, both Mr. Hammoudeh and Mr. Sherman allege that in violation of the California Education Code, §§ 220 and 66270, *et seq.*, The Regents were deliberately indifferent to plaintiffs' complaints of harassment.  *Id.*, Ex. A ¶¶ 127–36.

## II.     LEGAL STANDARD

A motion for summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

The moving party bears the initial burden of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A party moving for summary judgment who does not have the ultimate burden of persuasion at trial "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party meets its initial burden at summary judgment, the burden then shifts to the nonmoving party to go beyond the pleadings and designate specific materials in the record to show that there is a genuinely disputed material fact.  Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324.  The nonmoving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence showing a genuine issue of material fact for trial.  *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1102.  It is not the Court's task to "scour the record in search of a genuine issue of triable fact."  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  A genuine issue for trial exists if the nonmoving party presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor.  *Anderson*, 477 U.S. 242 at 248–49.  The Court must draw all reasonable inferences in favor of the party against whom summary judgment is sought.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.   DISCUSSION

### A.   Plaintiffs' Title IX, Title VI and Education Code Deliberate-Indifference Claims

Plaintiffs allege that The Regents acted with deliberately indifference to their complaints of sexual harassment by Professor Achlioptas in violation of Title IX, Title VI, and the Education Code.  *See* Dkt. No. 1, Ex. A ¶¶ 75–85, 95–104, 127–36.  The Regents argue that these claims fail as a matter of law because plaintiffs cannot show that after receiving actual notice of Professor Achlioptas's conduct the University's response was clearly unreasonable.  Dkt. No. 35 at 12–18.  Plaintiffs counter that the University's response to their complaints about Professor Achlioptas's conduct was so delayed and inadequate that it amounts to deliberate indifference.  Dkt. No. 47 at 15–19.  The Court agrees with plaintiffs that there is a genuine dispute of material fact that precludes summary judgment as to these claims.

Title IX provides, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Victims of sex discrimination have a private right of action against recipients of federal education funding for alleged Title IX violations, *see Cannon v. Univ. of Chi.*, 441 U.S. 677, 709 (1979), and may seek damages for those violations, *see Franklin v. Gwinnett Cty. Pub. Schs.*, 503 US. 60, 75–76 (1992).  "Title IX's express means of enforcement—by administrative agencies—operates on an assumption of *actual notice* to officials of the funding recipient."  *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 288 (1998) (emphasis added).  In the absence of an official policy that discriminates on the basis of sex, a plaintiff may not recover damages unless "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond."  *Id.*  A plaintiff must demonstrate that the official's response amounted to "deliberate indifference to discrimination."  *Id.*   To avoid liability, "the recipient must merely respond . . . in a manner that is not clearly unreasonable."  *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1105 (9th Cir. 2020) (citing *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 649 (1999)).  The reasonableness of that response "depends on the educational setting

United States District Court
Northern District of California

United States District Court
Northern District of California

1   involved—what would be unreasonable in the context of an elementary school might not be

2   unreasonable in the context of a university." *Id.* (quoting *Davis*, 526 U.S. at 649).

3          Title VI "is parallel to Title IX except that it prohibits race discrimination, not sex

4   discrimination, and applies in all programs receiving federal funds . . . The two statutes operate in

5   the same manner." *Gebser*, 524 U.S. at 286. "When a [school] district is 'deliberately indifferent'

6   to its students' right to a learning environment free of racial hostility and discrimination, it is liable

7   for damages under Title VI." *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1034 (9th

8   Cir. 1998); *see also Bryant v. Indep. Sch. Dist. No. 1-38 of Garvin Cty.*, 334 F.3d 928, 934 (10th

9   Cir. 2003) (instructing the district court on remand to apply the Supreme Court's Title IX

10  "deliberate indifference" test to plaintiff's Title VI claim).

11         California's Education Code prohibits discrimination on the basis of sex by any

12  educational institution that receives financial assistance from the state. Cal. Educ. Code § 66270.[3]

13  "Like Title IX, the antidiscrimination provisions in the Education Code are designed primarily to

14  prevent recipients of state funding from using such funds in a discriminatory manner: Both

15  statutes condition their prohibition on discrimination on the receipt of public funding; both broadly

16  proscribe discrimination in education; and both have procedures for administrative enforcement."

17  *Donovan v. Poway Unified Sch. Dist.*, 167 Cal. App. 4th 567, 603 (2008). Enforcement of the

18  Education Code's antidiscrimination law rests on the assumption of "actual notice" to the funding

19  recipient. *Id.* (citing Cal. Code Regs., title 5, § 4670, subd. (a)(1)). Actual notice to the funding

20  recipient ensures that liability for money damages is based on a funding recipient's "*own*

21  deliberate indifference to known acts of harassment." *Id.* at 605 (emphasis in original).

22         For purposes of this motion, the parties seem to agree that the University received actual

23  notice of Professor Achlioptas's conduct towards Mr. Hammoudeh and Mr. Sherman by late

---

[3] Plaintiffs cite both Education Code §§ 220 and 66270. However, § 220 prohibits discrimination in any preschool, elementary, or secondary school. *See* Cal. Educ. Code § 210.3 (defining "educational institution). The Court assumes plaintiffs rely solely on § 66270, which prohibits discrimination in any postsecondary educational institution.

United States District Court
Northern District of California

August 2018. *See* Dkt. No. 35 at 17; Dkt. No. 47 at 15; Dkt. No. 52 at 2.[4]  Dkt. No. 35-6, Ex. 7 at 10. In addition, plaintiffs note that Dean Wolf forwarded Mr. Hammoudeh's August 28, 2018 email to Susan Fellows, who then notified Campus Provost and Executive Vice Chancellor Marlene Tromp. Dkt. No. 48-5, Ex. 29 at 1. It appears to be undisputed that Dr. Tromp had authority to initiate investigations involving violations of the Faculty Code of Conduct and to take immediate action if warranted.[5]  Dkt. No. 35-6, Ex. 5 at 6; Dkt. No. 48-5, Ex. 29 at 2.

The Regents argue that "[o]nce UCSC received actual notice, it did not remain idle." Dkt. No. 35 at 24–25. They argue that the University placed Professor Achlioptas on administrative leave, worked with plaintiffs to identify the most appropriate administrative process, and then initiated both a Faculty Code of Conduct investigation and a Title IX investigation. *Id.* at 24. After the investigations were completed, the University took steps to terminate Professor Achlioptas's employment, prompting him to resign, and denied him emeritus status. *Id.* According to The Regents, these actions demonstrate, as a matter of law, that the University was not deliberately indifferent to plaintiffs' claims of sexual harassment. Dkt. No. 35 at 24–25.

Plaintiffs respond that the University did not act promptly or effectively. The record reflects that the University did not place Professor Achlioptas on involuntary leave until December 21, 2018, almost four months after Mr. Hammoudeh's August 2018 communications with Dean Wolf and Ms. Scricca. Dkt. No. 35-6, Ex. 22. In the intervening time period, no University official contacted Mr. Sherman to inquire further about the information Mr. Hammoudeh had

---

[4] UCSC's Title IX Officer is responsible for overseeing the reporting process and investigating a report made pursuant to the SVSH policy. Dkt. No. 35-6, Ex. 7 at 9. Soon after receiving such a report, the Title IX Officer must assess the report to determine if the health and safety of the campus community is at risk. Dkt. No. 35-6, Ex. 7 at 10. The Title IX Officer should "implement temporary remedies immediately necessary (including no contact orders)." Dkt. No. 35-6, Ex. 7 at 10, 24–25. Importantly, the Title IX Officer should determine whether an investigation is necessary even if the complainant requests that no investigation occur. Dkt. No. 35-6, Ex. 7 at 12.

[5] UCSC has its own policy on faculty conduct and the administration of discipline. Dkt. No. 35-6, Ex. 5. Under this policy (last revised December 2018), "[t]he Campus Provost may initiate involuntary leave with pay prior to the initiation of disciplinary action" if respondent's continuance of regular duties or presence on campus presents a strong risk of immediate and serious harm to the campus community. *Id.*, Ex. 5 at 6.

1    provided regarding Professor Achlioptas's conduct towards Mr. Sherman.  Dkt. No. 47 at 17–18.

2    The record contains conflicting evidence regarding when the University required Professor

3    Achlioptas to avoid contact with plaintiffs or other students.  Dkt. No. 35-6, Ex. 22; Dkt. No. 35-6,

4    Ex. 23; Dkt. No. 48-4, Ex. 3 at 131–32; Dkt. No. 48-5, Ex. 6 at 225.  Further, plaintiffs say that

5    they received little assistance navigating the University's "labyrinthine complaint systems."  Dkt.

6    No. 47 at 17–18.  No University official offered counseling to either student.  *Id.*

7         The Regents correctly observe that plaintiffs' showing of deliberate indifference must meet

8    a high standard—i.e., a negligent or careless response does not rise to the level of deliberate

9    indifference.  Dkt. No. 35 at 15–16 (citing *Karasek*, 956 F.3d at 1105; *Oden v. N. Marianas Coll.*,

10   440 F.3d 1085, 1089 (9th Cir. 2006)).  However, drawing all reasonable inferences in plaintiffs'

11   favor, the Court concludes that a reasonable jury could find that, given the nature of the

12   harassment, the University's actions were inadequate, and that there exists a genuine dispute of

13   material fact as to whether The Regents acted with deliberate indifference after receiving notice of

14   plaintiffs' complaints about Professor Achlioptas's conduct.

15        The Court denies The Regents' motion for summary judgment as to claims 1, 3, and 7.

16   **B.    Mr. Sherman's Title IX Retaliation Claim**

17        Mr. Sherman alleges that The Regents retaliated against him for his complaints about

18   Professor Achlioptas in violation of Title IX.  Specifically, he alleges that faculty members made

19   false and offensive statements about his mental health, withheld authorship credit for his research

20   publication and for his research, delayed his completion of a master's program, and interfered with

21   his employment prospects.  Dkt. No. 1 ¶ 90.  The Regents move for summary judgment on this

22   claim on three grounds.  First, they argue that Mr. Sherman has not shown that the *University*, and

23   not just individual professors, retaliated against Mr. Sherman.  Dkt. No. 35 at 18–19.  Second, they

24   argue that Mr. Sherman did not suffer any materially adverse action because he was able to

25   complete his thesis and earn his degree, and he was absolved of any research misconduct by the

26   University.  *Id.* at 19.  Third, they argue that Mr. Sherman cannot establish a causal connection

27   between his protected activities and his Title IX complaint because there is no evidence that the

28   individual professors knew about Mr. Sherman's complaint at the time they engaged in the alleged

adverse actions.  *Id.* at 20.  The Regents' first argument is dispositive here.

In support of his Title IX retaliation claim, Mr. Sherman contends that "Prof. Pang took action that threatened to delay Mr. Sherman's graduation by initially insisting he begin from scratch with his research.  Mr. Sherman was only allowed to form a thesis committee and graduate after a long battle.  Most disturbingly, Prof. Sgourakis accused Mr. Sherman in writing of severe mental illness, and brought an unfounded complaint against him for academic fraud."  Dkt. No. 47 at 20.  In addition, Mr. Sherman alleges that "[a]t Professor Achlioptas' request, the thesis committee outrageously insisted—the day before Plaintiff Sherman's thesis was to be approved— that Plaintiff Sherman credit his abuser, Professor Achlioptas, multiple times in the body of the thesis, contrary to UCSC thesis guidelines."  Dkt. No. 1, Ex. A ¶ 34.  The Regents argue that Mr. Sherman may not recover against the University based solely on principles of *respondeat superior* with respect to conduct by Professors Pang and Sgourakis and the members of Mr. Sherman's thesis committee.  Dkt. No. 35 at 19 (citing *Davis v. Folsom Cordova Unif. Sch. Dist.*, 674 F. App'x 699, 702 (9th Cir. Jan. 9, 2017); *Tanjaya v. Regents of the Univ. of Cal.*, 830 F. App'x 526, 527 (9th Cir. Nov. 30, 2020)).  Mr. Sherman does not respond to this argument.  *See* Dkt. No. 47 at 19–20.

The Court agrees with The Regents.  In order to prevail on a Title IX retaliation claim, a plaintiff must show that the *funding recipient* retaliated against him because he complained of sex discrimination.  *Jackson v. Birmingham Board of Education*, 544 U.S. 167, 174 (2005).  That is, "an appropriate official of the funding recipient must have actual knowledge of discrimination and respond with deliberate indifference before a private party may bring suit."  *Id.* at 180 (citing *Gebser*, 524 U.S. at 288, 289–90).  In *Jackson*, the school board *itself* terminated the plaintiff's coaching duties after he complained to his supervisors about unequal treatment of the girls' basketball team.  *Id.* at 171–72.  Similarly, in *Gebser*, the Supreme Court held that an educational institution is responsible under Title IX only for its "own official decision[s]," not "for its employees' independent actions."  524 U.S. at 290–91; *see also Davis*, 526 U.S. at 640–42 ("reject[ing] the use of agency principles to impute liability to the [funding recipient] for the misconduct of its teachers").

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Here, The Regents point to evidence that university officials took immediate action to

2    address the alleged retaliation upon receiving notice of it.  Dkt. No. 35-5 ¶¶ 9-12.  Mr. Sherman

3    does not rebut this evidence or respond to The Regents' argument on this point.  *See* Dkt. No. 47

4    at 19–20.  Mr. Sherman must do more than produce evidence that individual employees of the

5    University retaliated against him.  He must show that the University itself was deliberately

6    indifferent to the misconduct of its employees.  *See, e.g., Bose v. Bea*, 947 F.3d 983, 988-91 (6th

7    Cir. 2020) (college not liable for Title IX retaliation based on professor's conduct alone); *cf.*

8    *Feminist Majority Foundation v. Hurley*, 911 F.3d 674, 695–96 (4th Cir. 2018) (concluding that

9    plaintiffs had sufficiently alleged a retaliation claim against university, where the plaintiffs

10   promptly reported retaliatory conduct by other students to the university, which allegedly took

11   little or no action to address such conduct over several months, and where [the Title IX

12   coordinator] actually asserted that the university had "no recourse" for the harassing and

13   threatening behavior of [university] students); *Papelino v. Albany Coll. of Pharm. of Union Univ.*,

14   633 F.3d 81, 92–93 (2d Cir. 2011) (concluding that a jury could find actionable retaliation by

15   university, where dean for student affairs took no action after receiving report of alleged

16   retaliation against student).  He has not done so.

17   Because Mr. Sherman has not shown that there is any genuine dispute that the University

18   acted reasonably to address Mr. Sherman's complaints of retaliation by individual employees of

19   the University, The Regents are entitled to summary judgment on claim 2.

20   **C.    Plaintiffs' FEHA claims**

21   Plaintiffs assert that The Regents violated the California Fair Employment and Housing

22   Act ("FEHA") in two ways.  *See* Dkt. No. 1, Ex. A ¶¶ 105–121.  First, both plaintiffs claim

23   employment discrimination based on race and/or national origin, saying that they were paid less

24   and treated less favorably by Professor Achlioptas as compared to another graduate student who

25   was of Greek descent like the professor (claim 5).  *Id.*, Ex. A ¶ 118.  Second, Mr. Hammoudeh

26   claims Professor Achlioptas subjected him to a hostile work environment based on his race,

27   religion, and national origin (claim 4).  *Id.*, Ex. A ¶ 109.  The Regents move for summary

28   judgment on both FEHA claims, arguing, among other things, that both claims are time-barred.

1    Dkt. No. 35 at 20–23.

2              **1.      Plaintiffs' National-Origin Discrimination Claims**

3              In support of their national-origin discrimination claim, Mr. Hammoudeh and Mr. Sherman

4    argue that Professor Achlioptas favored a Greek graduate student and disfavored them because

5    they were not Greek.  Dkt. No. 47 at 22.  The Regents argue that neither plaintiff suffered an

6    adverse employment action, and even if they did, they cannot show that their national origin was a

7    substantial motivating reason for the adverse action.  In addition, The Regents argue that

8    plaintiffs' discrimination claims are time-barred.  Dkt. No. 35 at 21–22.

9              The Court considers The Regents' statute of limitations argument first.  FEHA's

10   discrimination provision concerns only explicit changes to the "terms, conditions, or privileges of

11   employment."  *Roby v. McKesson Corp.*, 47 Cal. 4th 686, 705–6 (2009) (concluding that there is

12   "no reason" to construe the FEHA's prohibition against discrimination to include harassment).

13   Here, the only relevant evidence plaintiffs cite in support of their FEHA discrimination claims is

14   that they were paid less than another graduate student who was of Greek descent.  With respect to

15   Mr. Sherman, it is undisputed that he discovered the pay discrepancy on June 16, 2018.  Dkt. No.

16   48-5, Ex. 11 at 4.  Under the then-applicable FEHA provision, Mr. Sherman had one year from the

17   date of this discovery to file a complaint with the California Department of Fair Employment and

18   Housing ("DFEH"), a prerequisite to pursuing a claim in court.  Cal. Gov't Code § 12960(d) (eff.

19   Jan. 1, 2018); *see Romano v. Rockwell Int'l, Inc.*, 14 Cal. 4th 479, 492 (1996) ("The timely filing

20   of an administrative complaint is a prerequisite to the bringing of a civil action for damages under

21   FEHA.").  Mr. Sherman did not file his DFEH complaint until July 17, 2019, about 13 months

22   after he discovered Professor Achlioptas would pay him and Mr. Hammoudeh less than the other

23   graduate student.  Dkt. No. 35-6, Ex. 30 at 4–6.  The continuing violation doctrine does not apply

24   to a single discrete pay decision that was discovered shortly after the decision was made.  *See*

25   *Richards v. CH2M Hill*, 26 Cal. 4th 798, 812 (2001) (the continuing violation doctrine considers

26   whether an employer is liable for acts taking place outside the limitations period if these acts are

27   sufficiently linked to unlawful conduct within the limitations period).  For this reason, the Court

28   concludes that Mr. Sherman's FEHA national-origin discrimination claim is time-barred, and The

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Regents are entitled to summary judgment in their favor.

2          With respect to Mr. Hammoudeh, the record is less clear.  Mr. Sherman's discovery of the

3   pay discrepancy cannot be imputed automatically to Mr. Hammoudeh, and it is not clear when Mr.

4   Hammoudeh discovered the discrepancy.  For this reason, the Court cannot conclude as a matter

5   of law that Mr. Hammoudeh's national-origin discrimination claim is time-barred.

6          On the merits, a decision to pay one person less than another may constitute an adverse

7   employment action.  An adverse employment action is one that "materially affects the terms,

8   conditions, or privileges of employment."  *McRae v. Dep't of Corrections & Rehabilitation*, 142

9   Cal. App. 4th 377, 386 (2006).  The "most restrictive view" is that an adverse employment action

10  is limited to ultimate employment decisions, "such as firing, demotion or reduction in pay."

11  *Pinero v. Specialty Rest. Corp.*, 130 Cal. App. 4th 635, 640 (2005).  The Regents rely on *Thomas*

12  *v. Dep't of Corrections* (Dkt. No. 35 at 21), but the facts of that case are distinguishable.  In

13  *Thomas*, the court reasoned that the actions plaintiff complained of were not material changes

14  because they consisted of relatively minor adversities, such as "a delayed check, an early job

15  change, and failure to receive one overtime check."  77 Cal. App. 4th 507, 512 (2000).  A

16  substantial pay difference is not similarly immaterial.

17         Citing evidence that Professor Achlioptas used abusive language, some of which referred

18  to his race or national origin, in communicating with him as late as July 2018, Mr. Hammoudeh

19  argues that it is plausible to conclude that he was paid less because of his race or national origin.

20  Dkt. No. 35-6, Ex. 27 at 40–41, 50–51.  Given the temporal proximity of Professor Achlioptas's

21  statements and his decision to pay Mr. Hammoudeh less than the other graduate student, a triable

22  issue of material fact exists as to whether discrimination was a substantial motivating reason for

23  Professor Achlioptas's decision regarding Mr. Hammoudeh's pay.  "If triable issues of material

24  fact exist whether discrimination was a substantial motivating reason for the employer's adverse

25  employment action, even if the employer's professed legitimate reason has not been disputed, the

26  FEHA claim is not properly resolved on summary judgment."  *Husman v. Toyota Motor Credit*

27  *Corp.*, 12 Cal. App. 5th 1168, 1186 (2017).

28         Accordingly, the Court denies The Regents motion for summary judgment on Mr.

24

1   Hammoudeh's national-origin discrimination claim.

2   **2.    Mr. Hammoudeh's Hostile Work Environment Claim**

3   Mr. Hammoudeh says he also was subjected to a hostile work environment based on his

4   race, religion, and/or national origin.  Dkt. No. 1, Ex. A ¶ 109.  The Regents argue that this claim

5   is time-barred because Mr. Hammoudeh delayed more than a year before filing a complaint with

6   the California DFEH.  Dkt. No. 35 at 22–23.

7   The Court agrees with The Regents.  The record reflects, and Mr. Hammoudeh does not

8   dispute, that Mr. Hammoudeh had no communications or in-person interactions with Professor

9   Achlioptas after July 12, 2018.  Dkt. No. 27 at 50.  Mr. Hammoudeh was employed by the

10  University from July 1, 2018 and September 30, 2018, and so cannot recover under the FEHA for

11  harassment that occurred before July 1, 2018.  Dkt. No. 35-2 ¶ 6.  Because Mr. Hammoudeh did

12  not file a complaint with the California DFEH until July 19, 2019, more than one year after his last

13  interaction with Professor Achlioptas, his hostile work environment claim is time-barred, and The

14  Regents are entitled to summary judgment.

15  **D.    Plaintiffs' Unruh Civil Rights Act Claims**

16  Plaintiffs claim that The Regents violated the Unruh Civil Rights Act by failing to

17  adequately respond to their complaints of harassment, thereby denying them the benefits and

18  privileges of the education provided by the University.  Dkt. No. 1 ¶¶ 122–126.  The Regents

19  move for summary judgment on two grounds.  First, they argue that the University is not a

20  "business establishment" for purposes of the Unruh Civil Rights Act.  Second, they argue that

21  plaintiffs cannot show intentional discrimination or that they were denied a good, service or

22  facility based on their protected status.  Dkt. No. 35 at 23–24.

23  In support of their first argument, The Regents rely on *Brennon B. v. Super. Ct. of Contra*

24  *Costa Cty.*, 57 Cal. App. 5th 367, 397 (2020)[6] for the proposition that public school districts are

25

26  _____

27  [6] The California Supreme Court granted review of the *Brennon B* decision on February 24, 2021.
    *B. v. S.C.*, 275 Cal. Rptr. 3d 232 (Mem.) (2021).  Under California Rule of Court 8.1115,

28  "[p]ending review and filing of the Supreme Court's opinion, unless otherwise ordered by the
    Supreme Court [], a published opinion of a Court of Appeal in the matter has no binding or
    precedential effect, and may be cited for potentially persuasive value only."

United States District Court
Northern District of California

not "business establishments" for purposes of the Unruh Civil Rights Act.  Even assuming that decision reflects a correct interpretation of the Act, *Brennan B.* does not compel the result The Regents advocate.  In *Brennon B.*, the court concluded a public school district is not a "business establishment" because "commercial transactions with the general public are not an integral part of a public school district's overall operations."  57 Cal. App. 5th at 389 (citation and internal quotation marks omitted).  In other words, "[p]ublic school districts do not sell the right to participate in the basic educational programs and services they deliver."  *Id.* (citation and internal quotation marks omitted).  By contrast, "a secular private school, charging tuition and generally open to school-age children, is likely a business establishment for purposes of the Act."  *Id.* at 391 (citation omitted).  The fact that the University charges tuition for its educational services distinguishes it from the public school district in *Brennan B.*  Moreover, in *Isbister v. Boys Club of Santa Cruz Inc.*, the California Supreme Court observed that the Unruh Civil Rights Act "expanded the reach of the prior public accommodations statute from common carriers and places of public accommodation and recreation … to include all business establishments of every kind whatsoever."  40 Cal.3d 72, 78–79 (1985) (citation and internal quotation marks omitted).  The original version of the bill that became the Unruh Civil Rights Act specifically extended its anti-discriminatory provisions to "schools," *see id.* at 79, and "[t]he broadened scope of business establishments in the final version of the bill, in [the California Supreme Court's] view, is indicative of an intent by the Legislature to include therein all private and public groups or organizations specified in the original bill that may reasonably be found to constitute business establishments of every type whatsoever," *id.* (citation and internal quotation marks omitted).  The Court is not persuaded that The Regents are not a "business establishment."

As to The Regents' second argument, for the same reasons that the Court concludes that a genuine dispute of material fact exists as to whether the University was deliberately indifferent to Professor Achlioptas's harassment of plaintiffs under Title IX, a dispute of material fact exists as to whether the University inadequately responded to plaintiffs' complaints of sexual harassment and so intentionally discriminated against them.  *See Nicole M. v. Martinez Unif. Sch. Dist.*, 965 F. Supp. 1369, 1389 (N.D. Cal. 1997) (construing an inadequate response of sexual harassment as a

denial of "advantages, facilities, privileges, or services" and "allegations of inadequate action on the part of a school district" can rise to the level of "intentional discrimination").

Accordingly, the Court denies The Regents' motion for summary judgment on claim 6.

## IV.   CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part The Regents' motion for summary judgment as follows:

With respect to plaintiffs' Title IX, Title VI, and California Education Code deliberate-indifference claims, the Court denies The Regents' motion.

With respect to Mr. Sherman's Title IX retaliation claim, the Court grants The Regents' motion.

With respect to plaintiffs' FEHA national-origin discrimination claims, the Court grants Regents' motion as to Mr. Sherman and denies The Regents' motion as to Mr. Hammoudeh.

With respect to Mr. Hammoudeh's FEHA hostile work-environment claim, the Court grants The Regents' motion.

With respect to plaintiffs' Unruh Civil Rights Act claims, the Court denies The Regents' motion.

**IT IS SO ORDERED.**

Dated: April 8, 2022

_Virginia K. DeMarchi_
VIRGINIA K. DEMARCHI
United States Magistrate Judge